IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| S.B.T., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:15-CV-00162-NJR-SCW |
| | ) | |
| KAREN MILLER, MISTY HUFF, DIANE | ) | |
| WOODS, ALEXIS CARLISLE, and | ) | |
| CYNTHIA TATE, in her official capacity | ) | |
| as Acting Director of DCFS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This matter comes before the Court on the cross-motions for summary judgment filed by Plaintiff S.B.T. and Defendants Karen Miller, Misty Huff, Diane Woods, Alexis Carlisle, and Cynthia Tate, in her official capacity as Acting Director of the Department of Children and Family Services ("DCFS") (collectively, "Defendants") (Docs. 51 and 54). S.B.T. brought this civil rights action under 42 U.S.C. § 1983 claiming Defendants deprived her of her liberty interests without due process of law, in violation of the Fourteenth Amendment to the United States Constitution. S.B.T. seeks compensatory damages, along with interest, costs, and fees. For the reasons discussed below, the motions are granted in part and denied in part.

BACKGROUND

A.      The Illinois Abused and Neglected Child Reporting Act

The Illinois Abused and Neglected Child Reporting Act, or ANCRA, 325 ILCS 5/1, *et seq.*, authorizes DCFS to take certain actions to protect the health, safety, and best

interests of Illinois children in all situations in which the child is vulnerable to abuse or neglect. *Id.* at 5/2(a). Under ANCRA, DCFS is obligated to receive and investigate reports of suspected child abuse or neglect. *See id.* 5/2(b), 5/7.3(a). Initial reports of suspected abuse or neglect may take the form of "hotline" calls made to the agency. *See id.* 5/7.6.

In investigating an initial report, DCFS must determine whether there is credible evidence of abuse or neglect. To do so, the DCFS investigator must evaluate every piece of information and evidence obtained during a child abuse and/or neglect investigation, including both inculpatory and exculpatory evidence.[1] 89 Ill. Admin. Code § 300.160(c)(2)(A). In child neglect investigations, inculpatory evidence means evidence showing or tending to show that a person neglected a child. *Id.* Exculpatory evidence is evidence tending to establish a person's innocence or evidence that tends to justify or clear a person from alleged fault or guilt, *i.e.*, evidence showing or tending to show that a person did not neglect a child. *Id.*

If credible evidence of child neglect exists after considering all inculpatory and exculpatory evidence, DCFS labels the report as "indicated." 325 ILCS 5/3, 5/7.12. If there is no such credible evidence, the report is deemed "unfounded." 325 ILCS 5/8.1, 5/7.12. Final determinations of "indicated" are recorded in the Central Register maintained by the agency. 325 ILCS 5/7.12. Indicated reports of most types of neglect,

---

[1] S.B.T. refers to this standard as a "heightened credible evidence" standard. The Seventh Circuit has rejected calling the standard anything more than a "rigorous credible evidence" standard, given that state regulations explicitly require the investigating officer to consider all evidence on both sides of the issue. *Dupuy v. Samuels*, 397 F.3d 493, 506 (7th Cir. 2005).

including the allegation at issue in this case, are registered for a period of five years and include identifying information about the perpetrator. 325 ILCS 5/7.14.

Additional procedures are provided if the individual accused of child neglect also works with children. Once the DCFS investigator and her supervisor recommend that a report should be indicated, the alleged perpetrator is entitled to an "administrator's teleconference" before a neutral person. 89 Ill. Admin. Code § 300.160(c)(1)(A). During the teleconference, the alleged perpetrator may be represented by counsel and may present to the presiding DCFS administrator any documents, statements, or other information that she believes will help tell her side of the story. *Id.* The administrator is also provided with a copy of all evidence gathered and reports drafted by the investigator concerning the purported abuse or neglect. *Id.* § 300.160(c)(3)(C). The administrator then makes a decision to uphold or decline the investigator's recommendation to "indicate" and notifies the alleged perpetrator of that decision. *Id.* § 300.160(c)(4)(D). Once a child care worker has been formally indicated, she may request an expedited appeal before an administrative law judge ("ALJ"). 325 ILCS 5/7.16. The ALJ may uphold the finding of indicated or amend an indicated report to be "unfounded," in which case the accused's identifying information is expunged from the Central Register. *Id.* If the indicated finding is upheld, the child care worker can appeal to the Illinois Circuit Court.

## B.     Allegation 60

Before DCFS will accept a report of child abuse or neglect, a specific incident of harm to a child must be alleged to have been caused. 89 Ill. Admin. Code. § 300, App'x B.

The Administrative Code provides a series of numbered "allegations" that meet this requirement. *See id.* All neglect allegations of harm are coded with a two digit number greater than 50. *Id.* "Allegation 60" is an allegation that neglect has occurred because the child's environment is "injurious to the child's health and welfare." *Id.*; *Julie Q. v. Dep't of Children & Family Servs.*, 995 N.E.2d 977, 979 (Ill. 2013).

On December 22, 2011, an Illinois appellate court determined that Allegation 60 exceeded the scope of authority granted to DCFS under ANCRA, and therefore was void *ab initio. See Julie Q.*, 963 N.E.2d 401, 413 (Ill. App. Ct. 2d Dist. 2011). The Illinois Supreme Court affirmed this decision in March 2013. *Julie Q. v. Dep't of Children and Family Servs.*, 995 N.E.2d 977, 986 (Ill. 2013). Prior to 1980, ANCRA listed several circumstances that constituted a "neglected child," including when the child was placed in "an environment injurious to the child's welfare." In 1980, the Illinois legislature removed the "environment injurious" language from ANCRA because it was deemed vague and overbroad. Despite the decision to remove this language from ANCRA, in 2001 DCFS adopted Allegation 60, which gave DCFS investigators authority to investigate individuals under the "environment injurious" standard. The Illinois Supreme Court determined that DCFS was without authority to include a definition of neglect in Allegation 60 that the legislature explicitly removed from ANCRA; thus, Allegation 60 was void. *Julie Q.*, 995 N.E.3d at 985.

Effective July 13, 2012, Illinois adopted an amended provision of ANCRA, which provided that a "neglected child" includes a child "who is subjected to an environment which is injurious insofar as (i) the child's environment creates a likelihood of harm to

the child's health, physical well-being, or welfare and (ii) *the likely harm to the child is the result of a blatant disregard of parent, caretaker, or agency responsibilities*." 325 ILCS 5/3 (emphasis added).

Even after the legislature amended ANCRA to revive the "environment injurious" language and add the "blatant disregard" requirement, DCFS did not promulgate a new Allegation 60 until an emergency rule was issued on January 1, 2014. Even still, the emergency rule did not include the "blatant disregard" requirement. After the normal rulemaking process, DCFS issued the final version of revised Allegation 60, which finally added the "blatant disregard" requirement, on June 14, 2014.[2] The final version of revised Allegation 60 also includes domestic violence as an example of circumstances that may create a risk of harm, but specifies that the adult victim of domestic violence is presumed not to be neglectful "so long as he or she has exercised precautionary measures to prevent or mitigate the real, significant and imminent risk of moderate to severe harm to the child." 89 Ill. Admin. Code. § 300, App'x B.

### C.    S.B.T.'s Indication for Child Neglect

In February and March 2013, S.B.T. was the subject of an investigation under ANCRA for child neglect. S.B.T. is a certified child welfare specialist and the mother of two living children and one stillborn child. Broche Taylor ("Taylor"), S.B.T.'s ex-husband and the father of her children, is an alcoholic who suffers from Bipolar

---

[2] On September 3, 2013, a class action lawsuit was filed on behalf of individuals who were investigated or indicated under the void Allegation 60. *Ashley M. v. DCFS*, 2013-CH-20278 (Ill. Cir. Ct. 2013). As part of the settlement agreement in that case, DCFS agreed to expunge indicated findings for those investigated or indicated under Allegation 60 between July 13, 2012, and December 31, 2013, to implement revised procedures for Allegation 60, and to train DCFS staff on the revised Allegation 60. *Id.* The final settlement agreement was entered on January 9, 2015, *after* S.B.T.'s indication for child neglect in this case was reversed by the Circuit Court and her name was removed from the Central Register.

Disorder. Taylor also has a 13-year history of domestic violence against S.B.T. (Doc. 55-1, p. 9, Doc. 55-13).

On February 13, 2013, DCFS received an anonymous hotline call indicating that S.B.T. locked Taylor out of her home because he was drunk. Taylor then threw a brick through the bedroom window, landing only a foot away from where S.B.T. and her five-month-old son were sleeping (Doc. 55, p. 2). As a result of this incident, DCFS began investigating Taylor. Defendant Karen Miller, a child welfare advanced specialist with DCFS, was initially assigned to the investigation, but went on leave after only two weeks (Doc. 53-2, pp. 3, 9). Defendant Miller knew S.B.T. professionally, but she did not think there was a conflict of interest (*Id.*, p. 4). When Defendant Miller went on leave, the investigation was assigned to Defendant Misty Huff, who also knew S.B.T. professionally (Doc. 53-3, p. 4). Defendant Huff alerted her investigative supervisor, Defendant Diane Woods, to the potential conflict (Doc. 56-5), but noted that she could handle the case objectively. Accordingly, Defendant Huff remained assigned to the investigation (*Id.*).

As her investigation of Taylor proceeded, Defendant Huff became concerned with S.B.T.'s pattern of behavior with regard to Taylor (Doc. 53-3, p. 41). Police reports from 2000 to 2013 showed Taylor assaulted S.B.T. numerous times, yet she continued to allow him around the children. In August 2010, S.B.T. filed for divorce and later sought an order of protection, reporting that Taylor abused and sexually assaulted her. S.B.T. subsequently dropped the order of protection when her divorce became final. On another occasion in 2012, S.B.T.'s then 11-year-old daughter reported an incident

involving Taylor where he told her to clean up dog poop in the middle of the night. When she refused, Taylor grabbed her by the throat and neck, scratching her face in the process (Doc. 55-8, p. 5-6). Defendant Huff learned that S.B.T. would sometimes press charges against Taylor; other times she refused. After the incident on February 13, 2013, S.B.T. obtained a second order of protection, but later dropped it so Taylor could see the children if he was sober (Ex. 1 at 2232-33). Numerous times, police offered S.B.T. a packet on domestic violence services, which she refused. (*Id.*, pp. 41-42). In each instance, S.B.T. allowed Taylor back into her home as long as he was sober.

On March 22, 2013, S.B.T. was added as an alleged perpetrator under Allegation 60 for providing an environment injurious to the health and welfare of her children (Doc. 56-7). At 1:10 p.m. that same day, Defendant Huff met with S.B.T. and notified her that she was the subject of a child neglect investigation (Doc. 53-4). During the meeting, Defendant Huff explained to S.B.T. that she had a right to an immediate teleconference because of her status as a child care worker. She also explained S.B.T.'s right to appeal any unfavorable decision (*Id.*). Defendant Huff also claims she gave S.B.T. a required notification form called a CANTS 8 form at that time, although S.B.T. asserts she never received a CANTS 8 notification[3] (Doc. 56-2, p. 6).

During the meeting, Defendant Huff and S.B.T. went over the many police reports demonstrating the history of domestic incidents and Taylor's problems with alcohol. S.B.T. explained why she dropped two orders of protection against Taylor (she wanted to help Taylor get services and for Taylor to be able to come to the home if he was not

---

[3] For the reasons discussed below, whether Defendant Huff gave S.B.T. the CANTS 8 form is immaterial and does not preclude the entry of summary judgment.

drinking) (Doc. 53-4). Defendant Huff talked to S.B.T. about the cycle of domestic violence and being a victim, but S.B.T. did not see herself as a victim. Defendant Huff also offered voluntary intact, in-home services, but S.B.T. denied any services. S.B.T. told Defendant Huff she had been going to counseling since the stillbirth of her child in December 2009, and she signed a release of information form for Defendant Huff to speak with her counselor. S.B.T. also gave Defendant Huff the names of collateral contacts who could provide evidence in S.B.T.'s favor (Doc. 53-4). Directly after this meeting, at 2:09 p.m., Defendant Huff conferred with her supervisor, Defendant Woods, and a decision was made at that time to recommend that S.B.T. be indicated for child neglect (Doc. 53-3, p. 50-53; Doc. 55-21).

After recommending that S.B.T. be indicated for child neglect, Defendant Huff spoke with the collateral contacts S.B.T. provided (Doc. 53-3, pp. 51-52). Although Defendants Huff and Woods recommended a finding of indicated, that decision could be changed up until the investigation was closed by "restaffing" the investigation (*Id.*, pp. 60-61). At 3:40 p.m. on March 22, 2013, Defendant Huff spoke with S.B.T.'s father, who acknowledged that Taylor has a problem with alcohol and that he often verbally abused S.B.T. However, S.B.T.'s father did not believe the children were at risk (Doc. 56-14). Defendant Huff spoke with contact Monique Stuckey at 4:03 p.m. Stuckey agreed that Taylor was a problem and that S.B.T. should "get rid of him while [she] can." Stuckey further stated that Taylor manipulates S.B.T. and says he needs her; S.B.T. then tries to fix or mother him. Stuckey also verified that S.B.T.'s daughter does not like Taylor (Doc. 56-15). Defendant Huff also spoke with the children's primary care

physicians that afternoon (a Friday) and on the following Monday morning. (Docs. 55-28, 55-29, 55-30). That Monday she also spoke with Sharon Reed, S.B.T.'s counselor at the Angela Center for Behavioral Health, who confirmed S.B.T. was in counseling for the loss of a child and "the domestic issues" (Doc. 56-16). Defendant Huff later testified that at the time she recommended the indicated finding, she had already made up her mind and none of the information provided by the collateral contacts was going to change it (Doc. 56-5, pp. 19, 20). Defendant Huff further stated that regardless of what the contacts would have said, "the evidence was already there to indicate" S.B.T. (*Id.*, p. 16).

Because S.B.T. was a child welfare worker, she was entitled to an additional layer of review by way of the administrator's teleconference. On April 4, 2013, Defendant Alexis Carlisle held the teleconference with S.B.T. Prior to the call, Defendant Carlisle told S.B.T. to send any documents S.B.T. wanted her to review. S.B.T. submitted a 12-page, single-spaced letter in support of her position. During the administrator's teleconference, Defendant Carlisle considered the documents S.B.T. submitted, the police reports, the investigative summary (which included information from S.B.T.'s collateral contacts), the fact that S.B.T. declined domestic violence services, and the safety of the children. Defendant Carlisle then made a final finding indicating S.B.T. for child neglect pursuant to Allegation 60. As a result of being "indicated," S.B.T.'s name was placed on the Central Register.

Upon notification of the indicated finding, S.B.T. filed an expedited administrative appeal on May 7, 2013. On July 22, 2013, the ALJ issued his Recommendation and Opinion. The ALJ recommended that the indicated finding be

affirmed based on evidence that S.B.T. was allegedly denying and minimizing past incidents of domestic violence, which placed S.B.T.'s children in an injurious environment.

In a letter dated July 24, 2013, Richard H. Calica, then Director of DCFS, issued the final administrative decision and informed S.B.T. that he was adopting the ALJ's decision to indicate her under Allegation 60, and that S.B.T.'s request for expungement of her record from the Central Register was denied.

On August 16, 2013, S.B.T. filed a *pro se* Complaint for Administrative Review in the Circuit Court of the Second Judicial Circuit, Jefferson County, Illinois. On February 6, 2014, the Circuit Judge found that the Director's decision to indicate S.B.T. was against the manifest weight of the evidence and reversed the Director's decision, thereby removing S.B.T. from the Central Register. At no point during the investigation or review of S.B.T.'s indication for neglect were her children removed from her custody.

### D.    S.B.T.'s Employment

Upon learning of the recommendation by Defendants Huff and Woods to indicate her on March 22, 2013, S.B.T. alerted her employer, Lutheran Child and Family Services ("LCFS"), a provider of child welfare services on contract with DCFS, that she had been indicated for child neglect (Doc. 53-8, p. 9). S.B.T. was not required to give her employer this information. At that time, LCFS decided to wait out the appeal process before taking any action. LCFS then fired S.B.T. on August 1, 2013, after the final finding of "indicated" for child neglect was entered. Furthermore, because S.B.T.'s name was listed on the Central Register, S.B.T. was unable to obtain other employment as a child care worker.

Shortly after the Circuit Court reversed the Director's final decision to indicate her, S.B.T. was rehired by LCFS as a child welfare caseworker.

S.B.T. subsequently filed this action pursuant to 42 U.S.C. § 1983 seeking "redress for the actions of Defendants Karen D. Miller, Misty D. Huff, Diane Woods, and Alexis Carlisle, who deprived [S.B.T.] of her liberty interest in pursuing her career, in violation of the due process clause of the Fourteenth Amendment to the United States Constitution." S.B.T. also seeks declaratory relief against the DCFS Director "insofar as the Director's office of DCFS maintained policies and practices of enforcing Allegation 60, a void policy, as well as the policy and practice of indicating domestic violence victims without considering exculpatory evidence."

On June 17, 2016, S.B.T. and Defendants filed cross-motions for summary judgment, which are ripe for consideration.

## LEGAL STANDARD

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 332-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by

specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence . . . ." *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)). Cross motions for summary judgment are treated separately under the standards applicable to each. *See McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008).

## ANALYSIS

S.B.T. has moved for summary judgment on the grounds that Defendants violated her procedural and substantive due process rights. Specifically, S.B.T. claims that Defendants violated her procedural due process rights by contravening the investigative process required by *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), and by failing to give her proper notice or a meaningful opportunity to be heard. She also claims Defendants violated her substantive due process rights when they interfered with her fundamental right to parent her children by indicating her for child neglect based on the "void" Allegation 60 and by permitting the indication despite the fact that she is a victim of domestic violence "in such a manner that shocks the conscience."

Defendants' motion for summary judgment argues that S.B.T. was not deprived of procedural or substantive due process because Defendants used valid procedures and applied state law appropriately. Defendants further claim they are entitled to judgment as a matter of law because S.B.T.'s claims are barred by *res judicata*, because Defendant Miller had no involvement in any conduct giving rise to S.B.T.'s claim, and because the other individual defendants are entitled to qualified or quasi-judicial immunity. Finally, Defendants assert that Defendant Cynthia Tate, sued in her official capacity as Acting Director of DCFS, is entitled to judgment as a matter of law on S.B.T.'s request for declaratory relief because there is no evidence of a continuing violation of federal law.

## I.    *Res Judicata*

Before reaching the merits of S.B.T.'s due process claim, the Court first addresses Defendants' argument that S.B.T. is barred from raising her claim on the basis of *res judicata*, or claim preclusion. Defendants assert that S.B.T. raised her due process claim in her Complaint for Administrative Review before the Circuit Court, and therefore is precluded from again bringing her claim in this Court.

Determining whether *res judicata* applies "requires a two-pronged inquiry: (1) whether the law of the state in which the prior judgment is rendered would give that judgment preclusive effect against the claims asserted in the federal action; and (2) whether the party against whom preclusion is asserted had a full and fair opportunity in the state proceedings to litigate the claims (i.e., whether the state proceedings satisfy minimum due process requirements)." *Welch v. Johnson*, 907 F.2d 714, 719 (7th Cir. 1990). Under Illinois law, *res judicata* applies when there was a final

judgment on the merits rendered by a court of competent jurisdiction, there is an identity of cause of action, and there is an identity of parties or their privies. *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302, 703 N.E.2d 883, 889 (Ill. 1998). "The party asserting the defense of *res judicata* has the burden of showing with clarity and certainty what was determined by the prior judgment." *Welch*, 907 F.2d at 720 (citing *LaSalle Nat'l Bank of Chicago v. County of DuPage*, 856 F.2d 925, 930-31 (7th Cir. 1988)). "Any doubt as to what was decided in the earlier action must be resolved against an application of *res judicata*." *Id.*

In this case, S.B.T.'s state court complaint included a claim that "[t]he indicated finding is being maintained in violation of the due process rights of Plaintiff." (Doc. 52-11). The state court judgment, however, only stated that "the director's decision was against the manifest weight of the evidence." (*Id.*). There is no further explanation by the Circuit Court, nor is there any transcript of the proceedings that demonstrates the claim was "fully and fairly litigated." Defendants merely assert, without any citation to the record, that S.B.T. "apparently abandoned adjudication of her due process claim." (Doc. 52, p. 13). Without more, the Court cannot say Defendants have met their burden of showing "with clarity and certainty what was determined by the prior judgment." *Welch*, 907 F.2d at 720. S.B.T. did raise her due process claim in state court, but the Circuit Court does not appear to have resolved the claim. Such uncertainty as to what was decided in state court must be resolved against applying *res judicata*. *See id.* (doubt as to what was adjudicated in earlier action must be resolved against an application of *res judicata*); *see also Smith v. Nolan*, 648 F.Supp. 972, 977 (N.D. Ill. 1986) (holding the plaintiff

was not barred by *res judicata* from litigating in federal court since the plaintiff attempted to raise federal due process claims before a police merit board, but the board declined to address the claims). Accordingly, the Court finds S.B.T. is not barred from bringing her due process claims in federal court.

## II.  Defendant Miller

Defendants next claim in their motion for summary judgment that Defendant Miller is entitled to judgment because she had no personal involvement in any conduct that gives rise to S.B.T.'s claim. In response, S.B.T. claims that Defendant Miller had a conflict of interest because she previously worked as S.B.T.'s immediate supervisor; thus, the entire investigation was "tainted at the outset."

S.B.T. brings this action pursuant to 42 U.S.C. § 1983. Section 1983 creates a cause of action against "[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Since a § 1983 cause of action is against a 'person,' in order '[t]o recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Knight v. Wiseman*, 590 F.3d 458, 462–63 (7th Cir. 2009) (quoting *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)). To be personally responsible, the defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.*

Here, Defendant Miller was not involved in the decision to indicate S.B.T. for child neglect. When the DCFS investigation began after the February 13, 2013 incident, Defendant Miller was only investigating Taylor. She then took a leave of absence two weeks into the investigation. It was not until the investigation was re-assigned to Defendant Huff that S.B.T. was added as an alleged perpetrator. Thus, although S.B.T. argues that Defendant Miller was biased, and due process requires "an informed evaluation by a neutral official," Defendant Miller had nothing to do with S.B.T.'s indication for child neglect. Because Defendant Miller cannot be personally responsible for any deprivation of S.B.T.'s constitutional rights, Defendant Miller is entitled to summary judgment in her favor.

## III.    Defendant Carlisle

Defendants also claim summary judgment is proper as to Defendant Carlisle because she is entitled to absolute judicial immunity. Absolute judicial immunity protects members of quasi-judicial adjudicatory bodies from suit when they perform duties that are functionally comparable to those of a judicial officer. The Seventh Circuit applies a functional approach to determine whether an official is entitled to absolute immunity. *Heyde v. Pittenger*, 633 F.3d 512, 516 (7th Cir. 2011) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). "'That is, we look to the nature of the function performed, not the identity of the actor who performed it . . . .'" *Id.* (quoting *Wilson v. Kelkhoff*, 86 F.3d 1438, 1443 (7th Cir. 1996) (internal citation omitted)). Absolute immunity applies to a person serving a quasi-judicial adjudicatory role when his or her duties are

"functionally equivalent to those of a judge or prosecutor." *Id.* (citing *Butz v. Economou*, 438 U.S. 478, 512–13 (1978)).

In *Butz*, the Supreme Court discussed the characteristics of quasi-judicial functions that courts should consider when determining whether absolute immunity applies:  (1) the need to assure that the individual can perform his functions without harassment or intimidation; (2) the presence of safeguards that reduce the need for damages actions as a means for controlling unconstitutional conduct; (3) the insulation from political influence; (4) the importance of precedent; (5) the adversarial nature of the process; and (6) the correctability of error on appeal. *Heyde*, 633 F.3d at 517 (citing *Butz*, 438 U.S. at 512).

Here, Defendants argue that Defendant Carlisle, the DCFS administrator who conducted the administrator's teleconference, was a member of a quasi-judicial adjudicatory body because she performed duties functionally comparable to those of a judicial officer. The Court agrees.

Defendant Carlisle's role as a DCFS administrator was functionally equivalent to that of a judge. She took no part in the investigation of S.B.T., rather acting as a neutral evaluator with regard to Defendant Huff's initial recommendation—a procedural "safeguard" designed to correct any errors affecting the alleged perpetrator's rights. *See Dupuy*, 397 F.3d at 508 ("[T]he decision-maker at the Administrator's conference is a person who has had no part in the investigative process."). At the administrator's teleconference, Defendant Carlisle reviewed Defendant Huff's investigative file and summary, while S.B.T. had the opportunity to present evidence and tell her side of the

story. Moreover, Defendant Carlisle's decision was immediately appealable to an Administrative Law Judge. *See Heyde*, 633 F.3d at 519 (citation omitted) ("The basis of the absolute immunity of judges is less that they are unlikely to commit wrongs than that their wrongs are largely remediable through the appellate process.").

DCFS administrators must be able to perform the administrator's teleconference without worrying about resulting lawsuits. Deciding whether to indicate a parent for child abuse or neglect, particularly when that decision affects both the individual's ability to parent his or her children and to maintain employment in the child care field, is an incredibly serious and difficult decision that is "likely to result in 'a multitude of lawsuits' if left unprotected.'" *L.W. v. Illinois Dep't. of Children and Family Servs.*, No. 13-cv-8463, 2014 WL 5822624, *9 (N.D. Ill. Sept. 10, 2014) (vacated in part on reconsideration) (quoting *Heyde*, 633 F.3d at 519).

Because the Court finds that Defendant Carlisle performed a quasi-judicial adjudicatory role and, thus, is entitled to absolute judicial immunity, summary judgment is granted in her favor.

## IV.    Defendant DCFS, through Acting Director Cynthia Tate

Defendants next claim that Defendant Cynthia Tate, sued in her official capacity as Acting Director of DCFS, is entitled to judgment because there is no evidence of a continuing violation of federal law. S.B.T.'s Complaint seeks declaratory relief against Defendant Tate "insofar as the Director's office of DCFS maintained policies and practices of enforcing Allegation 60, a void policy, as well as the policy and practice of indicating domestic violence victims without considering exculpatory evidence."

Specifically, S.B.T. seeks a declaration that DCFS violated her constitutionally protected due process rights under the Fourteenth Amendment and that DCFS's maintenance of policies authorizing an indicated finding against S.B.T. violated the Fourteenth Amendment.

Because the Director is sued in an official capacity, S.B.T.'s claim operates as a claim against the State of Illinois. *Hafer v. Melo*, 502 U.S. 21, 24 (1991) ("Suits against state officials in their official capacity . . . should be treated as suits against the State."). The Eleventh Amendment, with some exceptions, immunizes states and their agencies against suits brought in federal court. *Id.* One such exception is the *Ex parte Young* doctrine, which provides that a private party may sue individual state officials in federal court to obtain prospective relief for an ongoing violation of federal law. *MCI Telecommunications Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 345 (7th Cir. 2000). The United States Supreme Court has declined, however, to extend the reasoning of *Young* to claims for retrospective relief because "compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Green v. Mansour*, 474 U.S. 64, 68 (1985).

Furthermore, "[t]he Declaratory Judgment Act of 1934, 28 U.S.C. § 2201, permits a federal court to declare the rights of a party whether or not further relief is or could be sought." *Green*, 474 U.S. at 72. However, where there "is no claimed continuing violation of federal law," for example, because a law has been repealed, there is no "threat of state officials violating the repealed law in the future." *Id.; see also Watkins*, 789 F.2d 474, 484

(7th Cir. 1986) (a federal court does not have authority to adjudicate a challenge to a state policy no longer in effect).

Here, there is no threat of DCFS continuing to violate the Fourteenth Amendment. After Allegation 60 was deemed void and the Illinois legislature revised ANCRA, DCFS promulgated a version of Allegation 60 that comports with Illinois law. The final revised version of Allegation 60 was issued on June 14, 2014. S.B.T. merely seeks a declaration "that unconstitutional policies and practices were maintained and used against her, which includes not just Allegation 60 but the policies and practices indicating domestic violence victims as neglect perpetrators which, together with the misuse of Allegation 60, operated to deprive S.B.T. of her constitutional rights." (Doc. 22). In other words, she seeks a declaration from a federal court that the State of Illinois is responsible for administering a void state policy that is no longer in effect. The Eleventh Amendment prohibits this Court from doing so. Defendant Tate, in her official capacity as Acting Director of DCFS, is entitled to summary judgment.

## V.    Due Process

Having found that *res judicata* does not apply, that Defendants Miller and Carlisle are entitled to summary judgment on other grounds, and that DCFS, through Defendant Tate in her official capacity as Acting Director, is entitled to summary judgment on the claim for declaratory judgment, S.B.T.'s only remaining claim is that Defendants Huff and Woods, acting under color of state law, violated her procedural and substantive due process rights.

### A.    Procedural Due Process

S.B.T. first argues that Defendants Huff and Woods violated her procedural due process rights by depriving her of her liberty interest in pursuing her career in child care without due process of law. S.B.T. claims Defendants violated her due process rights by "erroneously indicating her for child neglect," failing to gather and consider exculpatory evidence before recommending she be indicated for child neglect, failing to give S.B.T. proper notice, and ignoring a conflict of interest in the investigation.

S.B.T. first claims Defendants interfered with her liberty interest in pursuing her profession as a child care worker by erroneously indicating her for child neglect. S.B.T. asserts that her erroneous indication for child neglect caused her name to be placed on the Central Register, which in turn caused her to be fired from LCFS. Moreover, she could not find work in her chosen field until her name was removed from the Central Register. By the time she was reinstated by LCFS, S.B.T. "suffered considerable damage resulting from the violation of her constitutionally protected liberty interest."

Defendants do not dispute that S.B.T. has a liberty interest in pursuing her chosen profession. *See Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005) (quoting *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 617 (7th Cir. 2002) ("when a state actor casts doubt on an individual's 'good name, reputation, honor or integrity' in such a manner that it becomes 'virtually impossible for the [individual] to find new employment in his chosen field,' the government has infringed upon that individual's liberty interest to pursue the occupation of his choice.")). To maintain a claim for violation of one's procedural due process rights, however, a plaintiff must show that a state actor has deprived him or her

of that liberty interest *without due process of law*. *Id.* To determine whether a procedural due process violation has occurred, a court must first consider whether there is a liberty interest that has been interfered with by the State. *Id.* If so, the court then must determine whether "the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

S.B.T.'s first argument disregards the second prong of the test for a violation of procedural due process. She claims her due process rights were violated simply by virtue of being erroneously indicated for child neglect, which led to her loss of employment. To the contrary, S.B.T.'s claim only satisfies the first prong of procedural due process. In *Dupuy*, the Court of Appeals noted that child care workers are effectively barred from future employment in the child care field once an indicated finding of child neglect against them is disclosed to and used by present or prospective employers and that "[s]uch circumstances squarely implicate a protected liberty interest." *Id.* In this case, DCFS indicated S.B.T. for child neglect, which caused her to lose her job and encounter difficulty finding new employment. Thus, she had a liberty interest that was interfered with by the State. The question for this Court then becomes whether the procedures leading to that deprivation were constitutionally sufficient. *Id.* S.B.T. has identified no procedures in her first argument that were constitutionally inadequate.

S.B.T. does argue in her second point, however, that the procedures leading to her indication for child neglect were constitutionally deficient because Defendants failed to follow the investigation process outlined by the Seventh Circuit in *Dupuy.* More

precisely, S.B.T. claims that Defendants failed to gather and consider exculpatory evidence before recommending a finding of "indicated."

In *Dupuy*, after determining that child care workers have a protected liberty interest in pursuing their chosen profession, the Seventh Circuit evaluated whether the procedural safeguards implemented by DCFS are sufficient to protect that interest. *Id.* at 504 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The Court reviewed the credible evidence standard, which expressly instructs the DCFS investigator to consider **all available evidence** that an incident of abuse or neglect did or did not occur—and to give all evidence the same consideration. *Id.* at 504-05. The Court of Appeals noted the importance of the interests of both parties. Child care workers want to avoid being stigmatized for a false indicated report, which prevents them from working in their chosen field until the finding is expunged. DCFS employees want to assure the safety and well-being of a child exposed to neglect, which requires them to "act promptly on the basis of meager evidence." *Id.* at 505. Given these competing interests, the Court found that the "credible evidence" standard implemented by DCFS is an appropriate safeguard at the pre-indication stage. Only after equally considering all of the available inculpatory *and exculpatory evidence* "may the investigator decide whether that totality of evidence would cause a reasonable individual to believe that a child was abused or neglected."[4] *Id.*

---

[4] The *Dupuy* requirement that an investigator take into account all inculpatory and exculpatory evidence is also clearly reflected in DCFS Policy and Procedures Section 300.60. *See also* 89 Ill. Admin. Code § 300.160(c)(2)(A) ("The investigator must evaluate every piece of information and evidence obtained during a child abuse and/or neglect investigation, including both inculpatory and exculpatory evidence."). However, this order is not based on Defendants' failure to follow state rules and regulations.

Based on the summary judgment evidence, it is clear that Defendants Huff and Woods did not consider all available exculpatory evidence *before recommending that S.B.T. be indicated* for child neglect. S.B.T. provided Defendant Huff with collateral contacts, including her parents, her children's physicians, and her mental health counselor at the Angela Center for Behavioral Health (Docs. 55-28, 55-29, 55-30), but Defendant Huff neglected to call any of the contacts prior to recommending that S.B.T. be indicated. Defendant Huff further admitted that the collateral contacts did not matter to her, because the decision to indicate had already been made and it was not going to change, regardless of what the contacts said.

Defendant Woods also admitted that exculpatory evidence was not considered prior to issuing the recommendation to indicate S.B.T. (Doc. 56-4, p. 19) and that the collateral contacts "could not have changed the outcome based on the facts that we had." She further testified that evidence of S.B.T.'s counseling sessions was another factor that should have been considered—but was not (*Id.* p. 22). Additionally, when a hotline call describes domestic violence, DCFS policy requires that the supervisor consult with a clinical domestic violence specialist, which Defendant Woods did not do (Doc. 56-5, pp. 9-10). While the violation of a department policy or regulation alone is insufficient to impose liability for a constitutional violation, *see Waubanascum v. Shawano County*, 416 F.3d 658, 666 (7th Cir. 2005), consideration of S.B.T.'s status as a victim of domestic violence could have provided crucial exculpatory evidence in this case.

In *Boyd v. Owen*, 481 F.3d 520 (7th Cir. 2007), the plaintiff was a police officer who argued that DCFS investigators did not obtain—or ignored—exculpatory evidence

before indicating him for child abuse. In that case, DCFS received a hotline call that a child had been struck by the plaintiff. *Id.* at 522. Three days later, the DCFS investigator and supervisor examined the child and her bruising, which was consistent with the information given on the hotline call. *Id.* at 523. When asked how she obtained the injury, the child identified the plaintiff as the perpetrator. *Id.* The supervisor then decided to take the child into protective custody. *Id.* On the ride to the field office, the child again identified the plaintiff as the person who caused her bruises. *Id.* At that point, the investigator and supervisor decided to indicate the plaintiff for child abuse. *Id.*

On appeal of the district court's denial of summary judgment for DCFS based on qualified immunity, the Seventh Circuit reviewed whether the procedures used in investigating the charge and issuing the indicated finding were constitutionally sufficient. *Id.* at 525. The Court began by discussing *Dupuy* and noting that the private interest at stake is even more substantial for child care workers than for police officers because indicated findings are not automatically transmitted to law enforcement employers as they are to child care employers. *Id.* at 526. In the context of child care workers, "**investigators** determining whether credible evidence existed to indicate abuse **must consider equally exculpatory and inculpatory evidence** in order to comport with due process." *Id.* (emphasis added). The Court continued:

> The indicated finding had an impact on Boyd's liberty interest in his employment by arguably leading to his termination in this case, as there was some evidence in the record that an indicated finding would operate as a bar to all law enforcement employment . . . . Yet, the investigators initially decided to indicate Boyd for abuse the night they examined Sarah, and based that indication almost entirely on her statement that Boyd was responsible for the bruising. That is not to say that the investigators could not have constitutionally reached that conclusion. The initial hotline report

had identified Boyd as the perpetrator and identified the locale of the bruising, and the physical evidence corroborated that claim. Sarah then identified Boyd, which again was consistent with the hotline report and with the subsequent interview of Knight. But, the investigators did not attempt to develop or consider alternate explanations. They failed to consider past records documenting abuse of Sarah by others, or her psychiatric condition, and failed to provide Boyd with an opportunity to respond prior to the indicated finding. That focus solely on inculpatory evidence, to the exclusion of exculpatory evidence, fails to comport with the requirements of due process, and accordingly Boyd has demonstrated that the actions presented a constitutional violation.

*Id.*

Likewise, in this case the DCFS investigator and supervisor, Defendants Huff and Woods, failed to develop or consider exculpatory evidence, which includes evidence that tends to justify or clear a person from alleged fault or guilt. 89 Ill. Admin. Code § 300.160(c)(2)(A). They failed to call S.B.T.'s collateral contacts or to consider the fact that S.B.T. was a victim of domestic violence, that the children were healthy and up to date on their physical examinations, and that S.B.T. had been seeing a counselor for years. Under the law of this Circuit, as clearly established by *Dupuy*, the failure to consider all evidence that would justify or clear S.B.T. of the allegations was a violation of her procedural due process rights.

In response, Defendants assert that it is the actions of Defendant Carlisle, the DCFS administrator who made the final decision to uphold the recommended finding of indicated, that should be the focus of the due process analysis, not the actions or omissions of Defendant Huff or Defendant Woods. But the procedure outlined in *Dupuy* could not be clearer:  it is the *investigator* who must take into account all available evidence that tends to show neglect did or did not occur because of the "need for an accurate evaluation of the facts even at this initial stage." *Dupuy*, 397 F.3d at 505; *see also*

*Boyd*, 481 F.3d at 526. "Only then may the investigator decide whether that totality of evidence would cause a reasonable individual to believe that a child was abused or neglected." *Id.* at 506. While it is true that the administrator does evaluate the evidence at the administrator's teleconference, the *Dupuy* court found that to be no substitute for the investigator's initial evaluation. Rather, the administrator's teleconference is an additional layer of review designed to ensure that the investigator's finding of "indicated" is properly supported by credible evidence. Indeed, review by a neutral administrator is, in part, the reason why the *Dupuy* court allowed DCFS to continue using the credible evidence standard rather than a clear and convincing or preponderance of the evidence standard for recommending an indicated finding. *See id.* at 505-07.

By failing to consider all evidence prior to recommending that S.B.T. be indicated for child neglect, Defendants Huff and Woods violated S.B.T.'s clearly established procedural due process rights.[5] Because the Court has determined that a constitutional violation occurred, it need not consider whether S.B.T. received proper notice or whether the DCFS employees had a conflict of interest that also deprived S.B.T. of due process.

**B.    Substantive Due Process**

S.B.T. also asserts that Defendants violated her substantive due process rights when they used her status as a victim of domestic violence to indicate her under the void Allegation 60, which caused her to lose her job, stifled her ability to pursue other

---

[5] Because Defendants violated S.B.T.'s due process rights, which were clearly established under *Dupuy*, they are not entitled to qualified immunity as argued for in their motion for summary judgment. *See Pearson v. Callahan*, 555 U.S. 223, 224 (2009) (qualified immunity applies unless an official's conduct violates a constitutional right that was clearly established at the time of the alleged misconduct).

employment in the child welfare field, tarnished her professional reputation, impeded her ability to parent her children, and irreparably harmed her emotional well-being.

The application of substantive due process "is very limited." *Viehweg v. City of Mount Olive*, 559 F. App'x 550, 552 (7th Cir. 2014) (quoting *Tun v. Whitticker*, 398 F.3d 899, 900–02 (7th Cir. 2005)). Substantive due process "provides heightened protection against governmental interference with certain fundamental rights and liberty interests" unless the infringement is narrowly tailored to serve a compelling state interest. *Washington v. Glucksberg*, 521 U.S. 702, 719–21 (1997); *Reno v. Flores*, 507 U.S. 292, 302 (1993). Fundamental rights are those "'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Khan v. Bland*, 630 F.3d 519, 535 (7th Cir. 2010) (quoting *Glucksberg*, 521 U.S. at 720–21). Fundamental liberty interests include "the right to marry, the right to have children, the right to marital privacy, the right to contraception, and the right to bodily integrity." *Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 832 (7th Cir. 2012). Parents' liberty interest "in the care, custody, and control of their children" has been described as "perhaps the oldest of the fundamental liberty interests recognized." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

Here, S.B.T. asserts that Defendants' actions violated her fundamental right to parent her children. S.B.T. does not allege, however, that Defendants caused her to lose custody of her children at any time. Nor does she allege that Defendants' conduct affected her ability to raise and care for her children. While she claims she "questioned her ability to parent," that in itself does not evidence an interference with her

constitutional right to parent. And, while she "considered giving her parents guardianship of her children," there is no evidence that actually occurred. Even if it had, it would have been S.B.T.'s choice to do so—not a requirement imposed by Defendants. S.B.T. is not entitled to summary judgment on this basis.

S.B.T. also claims that Defendants violated her substantive due process rights when they used her status as a victim of domestic violence to indicate her under the void Allegation 60. S.B.T. further contends that Defendants failed to follow DCFS procedures by not consulting with a clinical domestic violence specialist. S.B.T. asserts these actions caused her to lose her job, stifled her ability to pursue other employment in the child welfare field, and tarnished her professional reputation. Defendants assert in their motion that S.B.T. has no substantive due process right not to be indicated for child neglect. Furthermore, even if a fundamental right is implicated, at the time of the investigation, the Illinois legislature had already amended ANCRA to reinsert the "environment injurious" language. Thus, state law permitted Defendants to indicate S.B.T. under the environment injurious standard in Allegation 60.

The Court agrees with Defendants that S.B.T. has failed to allege interference with a fundamental right. When a non-fundamental liberty is at stake, "there is a residual substantive limit on government action which prohibits arbitrary deprivations of liberty by government." *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014). However, the Supreme Court has cautioned against expanding the scope of substantive due process beyond barring government interference with fundamental rights "because guideposts for responsible decisionmaking in this unchartered area are

scarce and open-ended." *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992). Where executive action is alleged rather than legislative action, one's substantive due process rights are only violated when the action "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("Historically, this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property.")).

Under this standard, the Court finds Defendants' actions do not rise to the level of arbitrary or conscience-shocking. While the Court is sympathetic to S.B.T.'s situation, there is no evidence to suggest that Defendants intended to injure S.B.T. by indicating her for child neglect, which ultimately caused her to lose her job. Ignoring for a moment the procedural deficiencies in the investigation, Defendants encountered a factual scenario where S.B.T.'s daughter was physically harmed by her ex-husband, her infant son was put in harm's way by her ex-husband, and S.B.T. herself continued to be physically harmed by a man who, time after time, she allowed back into her home during his periods of sobriety. While the Court no doubt understands that S.B.T. was a victim of domestic violence, the primary role of DCFS is protect children from abuse or neglect and ensure their safety and well-being. In fact, the evidence indicates Defendants Huff and Woods, despite relying on a void DCFS regulation, acted with the best interests of the children in mind. When put into context, the Court cannot say Defendants'

conduct was arbitrary or conscience-shocking. Accordingly, Defendants are entitled to summary judgment on S.B.T.'s substantive due process claim.

### CONCLUSION

For the reasons stated above, S.B.T.'s motion for summary judgment (Doc. 54) and Defendants' motion for summary judgment (Doc. 51) are **GRANTED in part** and **DENIED in part**. S.B.T. is entitled to summary judgment on her procedural due process claim against Defendants Huff and Woods, while Defendants Huff and Woods are entitled to summary judgment on S.B.T.'s substantive due process claim. Defendant Miller is entitled to summary judgment on S.B.T.'s due process claims because she had no involvement in the deprivation of any of S.B.T.'s constitutional rights. Defendant Carlisle is entitled to summary judgment on S.B.T.'s due process claims because she is entitled to absolute judicial immunity. Finally, Defendant DCFS, through Defendant Tate, is entitled to summary judgment on S.B.T.'s claim for declaratory judgment.

Judgment for S.B.T. on her procedural due process claim is as to liability only. This action shall now proceed to jury trial on the issue of damages.

**IT IS SO ORDERED.**

**DATED:   November 1, 2016**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**